```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION


RALPH D. HIGGINS,                    )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )    No. 4:08 CV 1237 ERW
                                     )                     DDN
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
          Defendant.                 )
```

**REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Ralph D. Higgins for disability insurance benefits under Title II, and Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. § 401, et seq. The action was assigned to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the ALJ's decision be reversed and remanded.

## I.  BACKGROUND

Plaintiff Ralph D. Higgins was born on January 25, 1957. (Tr. 21.) He is 5'8" tall with a weight that has ranged from 174 pounds to 196 pounds. (Tr. 162, 226.) He is single, and has one adult child. (Tr. 178.) He completed the Tenth Grade, and did not earn a G.E.D. (Tr. 8.) He last worked as a janitor in December 2005. (Tr. 105, 116.)

On January 30, 2006, Higgins applied for disability insurance benefits and supplemental security income,[1] alleging he became disabled

---

[1]This was not Higgins's first application for benefits. Higgins first applied for benefits on January 4, 2002. That application was denied on February 26, 2002, at an initial stage. Higgins applied for a second time on October 9, 2003. That application was denied on July
(continued...)

on August 17, 2002, due to a broken back, arm and heel injuries, depression, and dysthymia.[2] (Tr. 21-24, 87-94, 116.) He received a notice of disapproved claims on May 11, 2006. (Tr. 29.) After a hearing on March 19, 2008, the ALJ denied benefits on March 27, 2008. (Tr. 6-20, 26-40.) On July 9, 2008, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

## II. ADMINISTRATE RECORD

In 1988, Higgins earned about $1,600. In 1989, he had no earnings. In 1990, he earned about $1,800, in 1991, he earned about $6,600, in 1992, he earned about $2,800, and in 1993, he earned about $16,000. In 1994, he had no earnings. From 1995 to 2001, Higgins earned over $20,000 each year. In 2002, he earned about $400, but in 2003, he earned about $10,000. In 2004 and 2005, he earned about $2,500, and in 2006, he only earned $150. (Tr. 98.) A work activity report showed Higgins worked as a janitor in 2005, working about fifteen hours a week. He stopped working because of his medical condition. From December 2002 to May 2003, Higgins worked as a laborer for Demien Construction Company. He worked forty hours a week, but stopped working because of his disability. (Tr. 104-10.)

On December 18, 2002, Higgins went to the emergency room, complaining of pain in his neck, and right arm and wrist. He was given

---

[1](...continued)
24, 2005, after a hearing by an ALJ. These denials were not appealed to the district court. (Tr. 29.)

[2]Dysthymia, sometimes referred to as chronic depression, is a less severe form of depression. With dysthymia, depression symptoms can linger for long periods, but people who suffer from dysthymia are still usually able to adequately function. WebMD, http://www.webmd.com/depression/guide/chronic-depression-dysthymia (last visited January 19, 2010).

- 2 -

Vicodin and sent home in stable condition.[3] At the time, he was taking Tramadol and Toprol.[4] (Tr. 197-202.)

On September 29, 2003, Higgins saw Dr. Donald Schnurpfeil, complaining of chronic back pain. He had been involved in a car accident in August 2002. Higgins complained that he was unable to sit for prolonged periods, and had trouble lifting things. A physical examination showed Higgins had back spasms and decreased range of motion in his back. The doctor diagnosed him with lower back pain. (Tr. 162.)

On March 16, 2004, Albert Hesker reviewed an x-ray of Higgins's spine. The x-ray showed an old, healed deformity at L3, and no recent fractures.[5] There were no destructive or erosive changes, but there were mild hypertrophic degenerative changes in the thoracic and lumbar spine.[6] Otherwise, the disk spaces were well-maintained, except for mild levoscoliosis, and mild narrowing at L2-3.[7] (Tr. 155.)

On February 16, 2006, Higgins saw John Emmons, D.O. In a letter to Higgins's lawyer, David Camp, Dr. Emmons noted that Higgins had been living with his parents since his first injury in 1988. After his injury in 1988, Higgins took seven years off of work. From 1995 to

---

[3]Vicodin is a combination narcotic and non-narcotic, and is used to relieve moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited January 20, 2010).

[4]Tramadol is used to relieve moderate pain. Toprol is used to treat chest pain (angina), heart failure, and high blood pressure. WebMD, http://www.webmd.com/drugs (last visited January 20, 2010).

[5]The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back. The sacrum is immediately below the lumbar vertebrae. Stedman's Medical Dictionary, 226, 831, 1376, 1549, 1710, Plate 2 (25th ed., Williams & Wilkins 1990).

[6]Hypertrophy is the general increase in bulk of a part or organ, not due to tumor formation. Stedman's Medical Dictionary, 746.

[7]Scoliosis is lateral curvature of the spine. Stedman's Medical Dictionary, 1394.

2003, Higgins did lawn and gardening work, but was also off work for a period of two to three years. He resumed working as an ironworker in 2003. Higgins smoked a pack a day, and was not taking any medication at the time. A physical examination showed he was alert and oriented, with normal intellectual functioning. There was no sign of discomfort while seated. His chest and heart were normal, and his lungs were clear. His abdomen was obese, but there were no masses and no tenderness. His back showed tenderness at L2, with mild spasm noted, greater at the right than left. There was mild dextroscoliosis from T1-T5, and from T12-L5. The thoracic kyphosis and cervical and lumbar lordosis were within normal limits.[8] An examination of the upper extremities showed Higgins had normal strength in his left hand and arm, but 3/5 grip strength in his right arm, and 2/5 strength in his upper right extremity. Higgins could make a fist in each arm. A review of his neuromuscular system showed no abnormalities in pain, proprioceptive sensation, or vibratory sensation, except in the right forearm.[9] Dr. Emmons found Higgins walked with a limp, but otherwise, his gait was normal. He did not drift side to side, and did not reach out for support or balance. He could heel and toe walk, squat fully, and arise without assistance. He was able to kneel and arise on both knees alternately. (Tr. 178-83.)

Dr. Emmons diagnosed Higgins with a post-fracture of the lumbar spine, and a post-fracture of the right radius and ulna, with permanent reduction in rotation and dysesthesias of the right forearm.[10] He also

---

[8]Kyphosis is a deformity of the spine, characterized by extensive flexion. <u>Stedman's Medical Dictionary</u>, 830. Lordosis is an abnormal extension deformity - usually in the form of a backward curvature of the spine. <u>Id.</u>, 894.

[9]Proprioceptive means capable of receiving stimuli originating in muscles, tendons, or other internal tissues. <u>Stedman's Medical Dictionary</u>, 1269.

[10]The radius is the lateral and shorter of the two bones of the forearm. <u>Stedman's Medical Dictionary</u>, 1310. The ulna is the medial and larger of the two bones of the forearm. <u>Id.</u>, 1663. Dysesthesia is an impairment of sensation, short of anesthesia. It also refers to a condition in which disagreeable sensation is produced by ordinary
(continued...)

diagnosed Higgins with decreased grip and upper extremity strength, hypertension, osteoarthritis, major depressive disorder, general anxiety disorder, and insomnia. Based on this diagnosis, Dr. Emmon believed that Higgins could walk at least 200 yards. He also believed he could sit for 35 to 45 minutes, and stand for at least 20 minutes before needing to change positions or rest. Finally, he believed that Higgins could climb one flight of stairs, though with some difficulty, that he could reach above his head frequently, and that could perform fine motor tasks for 30 minutes. (Tr. 183-84.)

On February 22, 2006, Higgins saw Dr. Schnurpfeil, complaining of chronic back pain - though he was not taking any medication. A physical examination showed he had tenderness and decreased range of motion in his back, but was otherwise normal. The doctor diagnosed him with chronic back pain and hypertension. The doctor encouraged Higgins to quit smoking and lose weight, but noted that exercise was limited by Higgins's back problems. (Tr. 159.)

On March 1, 2006, Higgins completed a function report. In a typical day, he ate, took his prescribed medication, and then spent most of the time laying down. His impairments affected his ability to sleep, and he had some trouble taking care of himself. He used the microwave for most of his meals, and his housework was limited to laundry and cleaning his room. He lived with his mother. He went out about once a day, and would walk. He could walk about a 100 yards, with his cane, before he needed to rest. (Tr. 130-37.)

On March 15, 2006, Dr. Emmons completed a medical source statement. In the statement, Dr. Emmons indicated Higgins could sit for four hours, stand for two hours, and sit for two hours, in an eight-hour workday. He could continuously lift and carry five pounds, occasionally carry ten pounds, and occasionally lift up to twenty-five pounds. He had a significant manipulative limitation in his right hand, but not in his left. He could occasionally stoop and continuously reach over head. Higgins suffered from an old lumbar fracture, osteoarthritis, and right ankle problems, and these impairments produced up to four hours of daily

---

[10](...continued)
stimuli. Id., 476.

pain, with reduced range of motion. Dr. Emmons believed Higgins needed to use a cane, and needed to take breaks every ninety minutes, but did not believe he needed to lay down or take naps during the day. In his opinion, Higgins should not work full time. The cumulative effect of the pain and restrictions in Higgins's lumbar spine, right wrist, right forearm, and right ankle, "combined with the effects of his depression and anxiety, would probably make full-time employment an unrealistic goal." (Tr. 185-87.)

On March 31, 2006, Dr. Schnurpfeil did not have an opinion on whether Higgins could sit for six hours and stand/walk for two hours in an eight-hour workday. (Tr. 188.)

On May 4, 2006, Christine Cruzen, a senior counselor with the state office of disability determinations, completed a physical residual functional capacity assessment of Higgins. Cruzen believed that Higgins could occasionally lift and carry ten pounds, frequently lift and carry less than ten pounds, and perform unlimited pushing and pulling. Cruzen also believed Higgins could stand or walk for two hours and sit for six hours in an eight-hour workday. Cruzen based her assessments on the medical record. (Tr. 188-95.)

On May 9, 2006, A. Kresheck completed a psychiatric review of Higgins. Kresheck found Higgins suffered from major depressive disorder and generalized anxiety disorder, but concluded that these impairments were not severe. Kresheck also found Higgins had no limitation in his daily living activities or social functioning, and only mild difficulties in maintaining concentration, persistence, and pace. Kresheck found no repeated episodes of decompensation. Kresheck noted that Higgins denied taking any psychiatric medication, and that he did not have any history of counseling or psychiatric hospitalizations. (Tr. 164-76.)

On October 22, 2007, Higgins went to the emergency room, complaining of intense pain, 10/10, in his right forearm. His affect was appropriate. A comprehensive assessment showed edema and tenderness in his right forearm. His abdomen was soft and non-tender. An x-ray of his forearm revealed healing fractures to the right radial and ulnar

shafts, but no acute fractures or dislocations. He was given Vicodin. (Tr. 203-05, 260-66.)

On October 25, 2007, Higgins went to the emergency room, complaining of abdominal pain. His medical history revealed that he had fractured the radius and ulna in his right forearm in 1989, which required plating and an additional surgery in 1991. At the time, Higgins was taking Ultram, as needed, for his abdominal pain, and Toprol.[11] He was not employed. A physical examination showed Higgins was well-developed and well-nourished, and in obvious distress from the abdominal pain. His heart rate and rhythm were regular, but his abdomen was mildly distended. An ultrasound of his abdomen showed a large, calcified gallstone. Donna Richardson, M.D., diagnosed him with cholelithiasis and probable acute cholecystitis.[12] He was taken to the operating room, where he underwent gallbladder surgery, without any complications. He was dismissed on October 28, 2007. (Tr. 208-12, 248-59.)

On October 27, 2007, Higgins completed a disability questionnaire. He noted having a broken right arm, shingles, a broken back, and gallbladder problems. The back pain caused him spasms and constant pain, and prevented him from standing longer than fifteen minutes and lifting more than twenty pounds. Higgins wrote "n/a" in the section asking him to describe his mental health symptoms or problems. Higgins did not need caretaking. He saw Dr. Schnurpfeil, who prescribed his medication every six months. He had received physical therapy for his arm. He had been treated by an orthopedist and neurologist, but had not seen a psychologist or psychiatrist. Higgins reported crying spells, and feeling depressed about not being able to provide for himself or have fun. (Tr. 245-46.)

On October 31, 2007, Vikram Rao reviewed an x-ray of Higgins's abdomen. The x-ray revealed a small amount of liquid in the

---

[11]Ultram is used to relieve moderate pain. WebMD, http://www.webmd.com/drugs (last visited January 20, 2010).

[12]Cholelithiasis is the presence of concretions in the gallbladder or bile ducts. Stedman's Medical Dictionary, 295. Cholecystitis is inflammation of the gallbladder. Id., 294.

gallbladder, and post-surgical changes associated with gallbladder surgery. (Tr. 213-14.)

On November 15, 2007, Higgins saw Dr. Schnurpfeil. He was working on losing weight, and had had an episode of shingles a few weeks earlier. He was improving after his gallbladder surgery, but still needed pain medication, especially so he could sleep at night. A physical examination showed Higgins's skin was jaundiced, from the shingles rash, but that his lungs and heart were normal. Dr. Schnurpfeil diagnosed Higgins with hypertension, metabolic syndrome, and recent cholecystitis, and counseled Higgins to continue a healthy diet and to increase his activity according to his tolerance.[13] (Tr. 224.)

On January 24, 2008, Higgins saw Stanley London, M.D., for an orthopedic evaluation, complaining of pain in his right heel, lower back, and right forearm. Higgins had fractured a couple of his lower vertebrae, when he was involved in a car accident in 2002. He was placed in a cast for three months, but he continued to have pain and weakness in his back. He had one physiotherapy treatment and took some pain medication, but never had any injections. He fractured his right ankle in 1999 during a fall. He was placed in a boot for about six weeks, but continued to have pain and swelling in the heel area. He injured his right forearm in 1988 during a fall, and required plates and screws to set it. (Tr. 234-35.)

A physical examination showed Higgins had no clubbing or edema. He walked with a limp, favoring his right leg. He could squat, and heel and toe walk with some difficulty, but could not hop. He was able to get off and on the table without a lot of difficulty. A neurological examination showed Higgins was markedly restricted for straight leg lifting on the right, but less restricted on the left. He had some

---

[13]Metabolic syndrome is a cluster of conditions — increased blood pressure, elevated insulin levels, excess body fat around the waist or abnormal cholesterol levels — that occur together, increasing the risk of heart disease, stroke, and diabetes. MayoClinic.com, http://www.mayoclinic.com/health/metabolic%20syndrome/DS00522 (last visited January 20, 2010).

irregular hypesthesia in the right lower extremity.[14] His ankle movements were reasonably good. Examination of his right forearm showed full range of motion of the elbow with flexion-extension, but marked restriction on rotation. There was slight tenderness to touch on his lower back. Dr. London diagnosed Higgins with lower back pain, post-fracture, with radicular pain, a fractured forearm with some restrictions of motion, and a fractured right heel bone, with residual discomfort, that made walking difficult and necessitated a cane.[15] (Tr. 234-36.)

On January 24, 2008, Dr. London completed a range of motion assessment. Higgins could make a fist, fully extend his hand, and had 5/5 grip strength in his left hand, and 4/5 grip strength in his right hand. His upper and lower extremity strength were good, with 5/5 on the left side, and 4/5 on the right side. (Tr. 237-38.) That same day, Dr. London completed a medical report form for the Missouri Department of Social Services. On the form, Dr. London checked the box indicating that the duration of Higgins's incapacity was permanent. Otherwise, there were no other notations or supporting details included on the form. (Tr. 239-40.)

On January 28, 2008, Jack Tippett, M.D., reviewed x-rays of Higgins's right heel and lumbar spine. The x-rays of the heel showed signs of a previous fracture and a moderate size heel spur. The x-rays of the lumbar spine showed a healed compression deformity at L1, with 10% loss of height, a healed compression fracture at L3 with 50% loss of height, irregular narrowing at L2-3, and mild angulation laterally at L3. (Tr. 241-42.)

**Testimony at the Hearing**

On March 19, 2008, Higgins testified before the ALJ. He had worked as a laborer, ironworker, and janitor. He stopped working as a janitor

---

[14]Hypesthesia is diminished sensitivity to stimulation. Stedman's Medical Dictionary, 747.

[15]Radicular pain refers to nerve root pain. See Stedman's Medical Dictionary, 1308.

because the continuous bending and lifting had become difficult.  (Tr. 6-9.)

Higgins was involved in a car accident, which fractured vertebrae in his back.  He testified that the pain was still present in his lower back, and that he needed a cane for support.  Dr. Emmons prescribed the cane, but Higgins had been using the cane for about a year before the prescription.  Higgins had also broken his heel in 1999, and injured his right arm in 1988.  The right arm continued to give him pain.  His back, arm, and heel problems were the main problems.  (Tr. 9-13.)

Higgins tried working part-time as a janitor at his brother's law firm, but was unable to complete an entire four-hour shift.  He was only able to work about two hours at a time.  Higgins required a lot of time to complete his normal chores around the house.  Tasks that once took him only a few hours, now took him a day or two.  He would lay down about twice a day during the week to rest.  (Tr. 13-16.)

During the hearing, Dr. Jeff Magrowksi testified as a vocational expert (VE).  In his first hypothetical, the ALJ had the VE assume that Higgins could lift and carry twenty pounds occasionally and ten pounds frequently, could stand or walk for an unknown[16] number of hours, could sit for four hours in an eight-hour work day, could occasionally climb stairs, kneel, and crouch, but might need assistance to walk, and had limited finger manipulation.  Under the circumstances, the VE testified that Higgins could not perform his past work.  However, the VE believed Higgins could perform light, unskilled work, such as furniture rental consultant (295.357-018), information clerk (237.367-022), or children's attendant (349.677-018).  The VE testified that the information clerk position was performed as unskilled work, even though it was listed as semi-skilled.  (Tr. 16-18.)

In the second hypothetical, the ALJ had the VE assume that Higgins required a sit-stand option.  As long as there was a reasonable period between sitting and standing, the VE testified that Higgins could still perform the three listed jobs.  (Tr. 18.)

---

[16]The exact number of standing or walking hours included in the hypothetical question are not captured by the transcript.  (Tr. 17.)

In the third hypothetical, the ALJ had the VE assume that Higgins could lift and carry ten pounds occasionally, less than ten pounds frequently, could stand or walk for two hours in an eight-hour work week, and sit for six hours. Under the circumstances, the VE testified that Higgins could perform sedentary work, such as surveillance system monitor (379.367-010) or callout operator (237.367-014). (Tr. 18-20.)

### III. DECISION OF THE ALJ

The ALJ followed the five-step procedure in his decision. At Step One, the ALJ determined that Higgins had worked full-time from 1995 to 2001, but that his earnings dropped from 2002, onward. In 2003, he worked around three months for a construction company. In 2004 and 2005, he worked for his brother, but his earnings fell below the level of substantial gainful activity. (Tr. 26-32.) At Step Two, the ALJ found Higgins suffered from the residuals of a right heel fracture, a lumbar vertebral fracture, and a right arm fracture, and that these impairments were severe. In doing so, the ALJ summarized Higgins's visits to the doctor. (Tr. 32-35.) At Step Three, the ALJ concluded that Higgins's impairments did not equal a listed impairment. (Tr. 35.)

At Step Four, the ALJ found Higgins was unable to perform his past work, but that he retained the residual functional capacity (RFC) to lift and carry twenty pounds occasionally and ten pounds frequently, to sit, stand, and/or walk for four hours in an eight-hour workday, and that he could occasionally climb stairs, stoop, kneel, crouch, and crawl. Higgins was to avoid repetitive work with fine objects with his right hand. He might need a handheld device for walking. (Tr. 35-36.) The ALJ found that Higgins's impairments could reasonably be expected to produce the alleged symptoms, but that his statements concerning the intensity, duration, and limiting effects of those symptoms were not entirely credible. (Tr. 36-37.)

In doing so, the ALJ discounted the findings of Dr. Emmons and Dr. London. Each doctor only examined Higgins once, and Dr. Emmons examined Higgins at the request of his attorney, while Dr. London examined Higgins after he applied for Medicaid. The ALJ noted that Higgins had injured his back, but simply found no evidence to support his

allegations of disabling back pain.  The ALJ also discounted Higgins's complaints that his arm pain was disabling.  Higgins had injured his arm in 1988, yet worked for seventeen years after that, nine of which amounted to substantial gainful activity.  Finally, the ALJ noted that Higgins had alleged disability due to depression, but that there was no mention of depression or anxiety in treatment notes from Dr. Schnurpfeil or Dr. London.  (Tr. 37-38.)

Beyond that, the ALJ noted that Higgins had not received continuous treatment for his arm condition.  Higgins received pain medicine for his back pain, but there was no evidence he received physical therapy, injections, or other evaluations by orthopedic surgeons or neurosurgeons.  There was no evidence Higgins ever saw a mental health professional.  The ALJ found Higgins not completely credible, noting that Higgins told Dr. Emmons that he had been out of work for seven years after his arm injury, when he had really only been completely off of work for two to three years.  The ALJ also noted that Higgins had applied for disability in 2003, even as he was working at the substantial gainful activity level.  (Tr. 38.)

At Step-Five, the ALJ cited the testimony of the VE, and concluded that Higgins retained the RFC to perform jobs in the national economy.  Accordingly, the ALJ found Higgins was not disabled within the meaning of the Social Security Act.  (Tr. 38-40.)

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a

contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. Id. The claimant bears the burden of demonstrating he is no longer able to return to his past relevant work. Id. If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

In this case, the Commissioner determined that Higgins could not perform his past work, but that he was able to perform other jobs in the national economy.

## V.  DISCUSSION

Higgins argues the ALJ's decision is not supported by substantial evidence. First, he argues the ALJ's RFC finding was significantly different than the RFC that the VE relied on. Second, he argues the ALJ failed to address the conflicts between the VE's testimony and the Dictionary of Occupational Titles (DOT). Third, he argues that the ALJ

erred by incorrectly characterizing him as a younger individual. Fourth, he argues that there is no evidence that the jobs cited by the VE actually exist. Fifth, he argues that the ALJ failed to provide any reason for rejecting the RFC of Christine Cruzen, the medical consultant. Sixth, he argues that the ALJ erred by failing to order a consultative exam to evaluate his allegations of depression. (Docs. 13, 17.)

**Hypothetical Question to VE**

Higgins argues that the ALJ's RFC finding was significantly different than the RFC that the vocational expert relied on. In particular, he argues that the ALJ found he could only sit, stand and/or walk for four hours in an eight-hour day, but in the question to the VE, the hypothetical RFC included the ability to sit for four hours and stand and/or walk for another four hours.

The Commissioner can rely on the testimony of a VE to satisfy his burden of showing that the claimant can perform other work. Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008). For the VE's testimony to rise to substantial evidence, the ALJ's hypothetical question must be correctly phrased and must capture the concrete consequences of the claimant's deficiencies. Id. The ALJ's hypothetical question does not have to include all of the claimant's alleged impairments; it need include "only those impairments that the ALJ finds are substantially supported by the record as a whole." Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006).

In this case, the ALJ determined Higgins had the RFC to "lift and/or carry twenty pounds occasionally and ten pounds frequently; and sit, stand and/or walk four hours in an [eight-hour workday]." (Tr. 35.) At the hearing, the ALJ first asked the VE to assume that Higgins could "lift and carry up to 20 lbs occasionally, 10 lbs frequently. Stand or walk for [blank] hours of eight.[17] Sit for four hours out of eight." (Tr. 17.) The second hypothetical added a sit-stand option to

---

[17]Looking to the plaintiff's brief, it appears the ALJ asked the VE to assume Higgins could stand or walk for four hours in an eight-hour day. (Doc. 13 at 9.)

the first hypothetical. (Tr. 18.) In the third hypothetical, the ALJ asked the VE to assume that Higgins could occasionally lift ten pounds, frequently lift less than ten pounds, "[s]tand or walk for two hours out of eight" and "[s]it for six" hours out of eight. (Tr. 18.)

Looking to the text of the transcript from the hearing, the ALJ's ultimate RFC determination does not correspond to any of the three hypothetical questions posed to the VE. The ALJ's ultimate determination contemplated four hours of physical activity in an eight-hour work day, while each of the hypothetical questions contemplated eight hours of physical activity in an eight-hour work day. This disparity requires the court to reverse and remand. See Owens v. Astrue, No. 5:06 CV 736, NAM/GHL, 2009 WL 3698418, at *8 (N.D.N.Y. Nov. 3, 2009) ("The RFC findings contained in the decision must match the hypothetical posed to the expert."). In addition, the record fails to reveal exactly how many hours of walking or standing were included in the first hypothetical. This prominent omission, on its own, renders the hypothetical deficient. See Emery v. Astrue, Civil Action No. 07-2482, 2008 WL 5272454, at *3 (E.D. Pa. Dec. 18, 2008) ("Hypotheticals are considered deficient when important factors are omitted or the claimant's limitations are not adequately portrayed.").

At Step Five, the ALJ relied on the testimony of the VE to conclude that Higgins had the RFC to perform other work in the national economy. (Tr. 40.) But because the ALJ's hypothetical questions did not correspond to the ALJ's ultimate RFC determination, the VE's testimony does not rise to the level of substantial evidence. Accordingly, the ALJ's decision should be reversed and remanded.

**Conflicts with the DOT**

Higgins argues the ALJ failed to address the conflicts between the VE's testimony and the DOT, as required by Social Security Ruling 00-04p.

Because this case should be remanded, and may require new testimony from the VE, this issue is reserved to the ALJ upon remand.

**Younger Individual**

- 15 -

Higgins argues that the ALJ erred by incorrectly characterizing him as a younger individual.

The ALJ determines a claimant's age at the time of the hearing decision. Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 780 (6th Cir. 1987). At the time of the decision, Higgins was 51 years old, making him a person closely approaching advanced age, for whom his age might seriously affect his ability to adjust to other work. 20 C.F.R. § 404.1563(d). However, in his decision, the ALJ calculated Higgins's age from his alleged onset date, making him a younger person, for whom his age would not seriously affect his ability to adjust to other work. (Tr. 39); 20 C.F.R. § 404.1563(c). On remand, the ALJ should treat Higgins as a person closely approaching advanced age.

**Actual Jobs**

Higgins argues that there is no evidence that the jobs cited by the VE actually exist.

The ALJ may rely on government publications like the DOT to determine that a certain job exists in the national economy. 20 C.F.R. § 404.1566(d)(1). For disability purposes, a job exists in the national economy regardless of whether (1) the work exists in the immediate area in which the claimant lives; (2) a specific job vacancy actually exists; or (3) the claimant would actually be hired for the job. 20 C.F.R. § 404.1566(a); see also Bardabelias v. Sec'y of Health and Human Servs., No. 85 CV 4373, 1986 WL 14618, at *2 (E.D.N.Y. Oct. 31, 1986) ("The Secretary does not have to prove that an occupation actually exists in substantial numbers in the economy."). On remand, the ALJ may rely on the DOT to show certain jobs exist in the national economy.

**Medical Consultant**

Higgins argues that the ALJ failed to provide any reason for rejecting the RFC of Christine Cruzen, the medical consultant.

On May 4, 2006, Christine Cruzen completed a physical residual functional capacity assessment (PRFCA) form. (Tr. 189-95.) Cruzen was not a physician, but a senior counselor in the state office of disability determinations. (Tr. 188.) In her evaluation, Cruzen noted

that Higgins had the ability to stand and/or walk for two hours and sit for six hours in an eight-hour day. (Tr. 190.) At the end of the form, Cruzen inserted her typed name in the block entitled "Medical Consultant's Signature." (Tr. 195.)

The ALJ did not discuss Cruzen's evaluation in his opinion. Under the regulations, the ALJ must consider the findings of state agency medical consultants, and "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist. . . ." 20 C.F.R. § 416.927(f)(2)(i), (ii). However, non-medical sources may not be used to determine an impairment; non-medical sources may only be used to show the severity of an impairment. 20 C.F.R. § 416.913(a),(d). In fact, it is reversible error for the ALJ to rely on a PRFCA form completed by a non-medical consultant. Malone v. Astrue, No. 4:07 CV 1896 CAS, 2009 WL 426459, at *12 (E.D. Mo. Feb. 19, 2009) (citing Dewey v. Astrue, 509 F.3d 447 (8th Cir. 2007)). Looking to Malone, the ALJ did not commit reversible error by failing to discuss the evaluation of a non-medical source.

**Consultative Examination**

Higgins argues the ALJ erred by failing to order a consultative exam to evaluate his allegations of depression.

The ALJ is required to order medical examinations and tests only if the available medical records do not provide sufficient medical evidence to determine whether the claimant is disabled. Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994). In this case, the record contains several indications that Higgins did not suffer from a disabling mental condition. In February 2006, an examination showed Higgins was alert and oriented, with normal intellectual functioning. In May 2006, Kresheck found Higgins suffered from major depressive disorder and generalized anxiety disorder, but concluded that these impairments were not severe. In October 2007, during a visit to the emergency room, Higgins had an appropriate affect. That same month, Higgins wrote "n/a" in the section asking him to describe his mental health symptoms or problems. In the same questionnaire, Higgins

reported having crying spells and feelings of depression, but noted that he had not seen a psychologist or psychiatrist. The record also fails to show that Higgins ever required hospitalization or counseling for his depression and anxiety, or that he ever took any medication for his depression or anxiety. During the hearing before the ALJ, Higgins's lawyer did not seek to elicit any testimony concerning Higgins's depression or anxiety, and Higgins himself testified that his back, arm, and heel problems were his main problems. (Tr. 9-16.) Taken as a whole, the record provided sufficient evidence from which the ALJ could determine that Higgins's mental impairments were not disabling. See Combs v. Astrue, 243 F. App' x 200, 205 (8th Cir. 2007) (unpublished per curiam) (where the record indicated the claimant's depression was not disabling, the ALJ did not err by failing to order a psychiatric examination).

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be reversed and remanded under Sentence 4 of 42 U.S.C. § 405(g). Upon remand, the ALJ should ensure that the hypothetical question posed to the VE corresponds to the ultimate RFC determination. To that end, the ALJ may wish to hold a supplemental hearing. The ALJ should also treat Higgins as a person closely approaching advanced age.

The parties are advised that they have until February 8, 2010, to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

　　　　　　　　　　　　　　　　　　/S/   David D. Noce
　　　　　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**

Signed on January 22, 2010.